IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

DAWN L. BEST                                                          PLAINTIFF

V.                                         CIVIL ACTION NO. 1:15-CV-00086-NBB-DAS

WILLIAM D. JOHNSON, PRESIDENT
AND CHIEF EXECUTIVE OFFICER OF
TENNESSEE VALLEY AUTHORITY                                            DEFENDANT

FINDINGS OF FACT AND CONCLUSIONS OF LAW

The trial of this cause was held on September 19th and 20th of 2016. The plaintiff Dawn

Best sued Bill Johnson, President and CEO of Tennessee Valley Authority, for violating Title

VII and the Age Discrimination in Employment Act ("ADEA"). The jury returned a verdict in

TVA's favor on Plaintiff's Title VII claim. (*See* Doc. 80.) For the reasons stated in its Order on

Defendant's Motion to Strike Plaintiff's Jury Demand (Doc. 69), Plaintiff's ADEA claim was

tried before the Court. At the conclusion of trial, and after considering the proffered documents

and testimony, the Court found on the record that Plaintiff failed to prove her ADEA claim. (*See*

Doc. 73.) Having found for Defendant, the Court now enters its findings of fact and conclusions

of law pursuant to Federal Rule of Civil Procedure 52(a). *Ramirez v. Hofheinz*, 619 F.2d 443,

445 (5th Cir. 1980) ("In a trial without a jury, the judge, as the trier of fact, must state, with some

degree of precision, his findings of fact and conclusions of law.")

**I. Findings of Fact**

1.      TVA is a corporate agency and instrumentality of the United States of America.

16 U.S.C. §§ 831 to 831ee. Its transmission systems in North America span over 16,000 miles

and serve 9 million people in portions of seven states. http://www.tva.com/power/xmission.htm.

TVA sells its electricity to 154 local power company customers, as well as to 59 directly served

industries and federal facilities. https://www.tva.gov/Energy/Our-Customers.

2.     TVA's extensive transmission system covers roughly one third of Mississippi. Through 28 municipal and cooperatively owned local power companies, TVA serves 36 Mississippi counties and provides power to more than 337,700 households.  Additionally, it provides electric power to eight directly served industrial customers.  These relationships throughout the state resulted in TVA power sales in Mississippi totaling approximately $1.2 billion in fiscal year 2015.  https://www.tva.gov/About-TVA/TVA-in-Mississippi.  TVA is broken down into seven districts to serve its local power companies, and Mississippi is one of those districts.  (Wardlaw Direct, Trial Tr. Vol. II, 104:24-105:2.)

3.     Plaintiff Dawn Best has an electrical engineering degree from Mississippi State University.  (Best Direct, Trial Tr. Vol. I, 51:22-24.)  TVA hired Plaintiff as a power utilization engineer shortly after she graduated from college in 1979.  (Best Direct, Trial Tr. Vol. I, 52:6-53:8.)  Plaintiff worked at TVA for almost three years, then left to work at various jobs in Florida.  She returned to TVA in 1989, and resumed her work as a power utilization engineer.  Plaintiff served in various engineering roles until she became a customer service manager in 1997.  (Best Direct, Trial Tr. Vol. I, 54:7-22; 56:12-14; 57:18-58:13; 60:7-16; 62:2-23; 64:20-25; Pl.'s Ex. 2.)  In that job, she worked with TVA's municipal and cooperative power distributors. (Best Direct, Trial Tr. Vol. I, 66:14-67:6.)  Although her job title and level changed, Plaintiff remained in this customer service role until 2011.  (Best Direct, Trial Tr. Vol. I, 67:10-68:12; Pl.'s Ex. 2.)  In 2011, Plaintiff took a job as an industrial accounts manager in Mississippi.  (Best Direct, Trial Tr. Vol. I, 68:13-69:2; Pl.'s Ex. 2.)

4.     This gender and age employment discrimination case arises from Plaintiff's non-selection as TVA's Mississippi Customer Delivery General Manager (hereinafter, "General

Manager"), which is the highest-ranking TVA job in the state of Mississippi. (Wardlaw Direct, Trial Tr. Vol. II, 98:14-20.)

5.      Plaintiff applied for the General Manager job on January 15, 2013. (Best Direct, Trial Tr. Vol. I, 72:3-73:4; Pl.'s Ex. 37.)

6.      Van Wardlaw was the decision-maker for the General Manager selection. (Wardlaw Direct Trial Tr. Vol. II, 98:8-13.) Mr. Wardlaw has spent his entire career at TVA, and currently serves as its Executive Vice President of External Relations. (Wardlaw Direct, Trial Tr. Vol. II, 103:5-104:4.)

7.      When the General Manager position came open, Mr. Wardlaw testified that he had the discretion to "just pick someone that [he] thought was ready for the position based on [his] judgment." However, he chose to publicly post the position because TVA "had several good candidates internally" and because there were also "several people outside of TVA that [he] thought could potentially do the job," so he "wanted to open up that opportunity and see who the best candidate was." (Wardlaw Direct, Trial Tr. Vol. II, 106:5-19; Brown Direct, Trial Tr. Vol. II, 66:8-20; 69:13-17; Def's Ex. 27.)

8.      Mr. Wardlaw worked with Human Resources to post the position, but he did not directly involve himself in the posting process. (Wardlaw Direct, Trial Tr. Vol. II, 107:5-14.)

9.      As part of the initial steps of its selection process, TVA also conducted a "records review" of the applicants' competencies. This includes things like job history, performance reviews, and experience. This was the "first hurdle" in the selection process. The records review was not determinative; it was only a one of many "hurdles" in the selection process. The purpose of having these multiple "hurdles" was to create "several data points to insure you're

making a well-informed decision." (Brown Direct, Trial Tr. Vol. I, 134:1-21; 134:22-135:8; Brown Direct, Trial Tr. Vol. II, 62:21-64:7.)

10.     The top candidates following the records review proceeded to the next hurdle, which was an interview. Mr. Wardlaw did not participate in these interviews, but instead formed a team to conduct them. Mr. Wardlaw's goal at this stage was for the interview team to screen the candidate pool and bring the number of applicants down to a more manageable number, from which he could then make the final selection decision. He also wanted to bring together "a diverse group of folks" to weigh in on the decision. (Wardlaw Direct, Trial Tr. Vol. II, 108:21-109:18; Campbell Direct, Trial Tr. Vol. II, 49:22-50:1.)

11.     Plaintiff testified that five people interviewed her during the first round: Joie Brown (Human Resources); Rick Misso (Mississippi Customer Service Manager); Jimmy Allen (Senior Advisor to Van Wardlaw); Laura Campbell (Memphis District General Manager); and Jim Keiffer (Middle Tennessee General Manager). (Best Direct, Trial Tr. Vol. I, 73:15-74:2.) Plaintiff brought to the interview a resume, a "90-day plan," and letters of recommendation from several general managers at various Mississippi local power companies. (Best Direct, Trial Tr. Vol. I, 74:5-12; *see also* Pl.'s Exs. 35, 26-34.)

12.     Joie Brown confirmed that she participated in the first round of interviews. (Brown Direct, Trial Tr. Vol. I, 124:21-22.) Ms. Brown testified that the interview team asked the applicants the same questions, took copious notes, and, at the end of the interview, came to a consensus to rate each candidate's interview performance. (Brown Direct, Tr. Vol. I, 138:17-24.) Ms. Brown did not remember the exact details of the interview, but she did remember thinking that Plaintiff did not perform as well as the other candidates. (Brown Direct, Trial Tr. Vol. I, 139:5-140:25.)

13.     Laura Campbell, who is now TVA's Vice President of Customer Delivery, also confirmed that she participated in the first round of interviews.  (Campbell Direct Trial Tr. Vol. II, 47:1-6.)  At the time she sat on the interview panel, Ms. Campbell did not know the ages of any of the applicants; in fact, at the time, she thought that John Malone (the eventual selectee) was older than Plaintiff.  (Campbell Direct, Trial Tr. Vol. II, 50:2-17.)  Ms. Campbell did not remember the specific details of the interviews, but she did remember that John Malone "stood out."  She remembered that he "really showed a passion for wanting to lead Mississippi and really kind of dazzled," and that "he brought on a lot of charisma towards the end and linked a lot of the broader initiatives that TVA was looking to achieve to what he could bring to Mississippi."  (Campbell Direct, Trial Tr. Vol. II, 50:18-51:2.)

14.     At the end of the first interview, the team recommended that Tommy Jackson (age unknown), Reggie Bowlin (age unknown), John Malone (49 years old), and Bill Duke (age 55) proceed to a final round of interviews.  Plaintiff was not among the candidates that the team recommended to move forward.  The team told Mr. Wardlaw that they felt the Plaintiff had not performed well in the interview.  (Wardlaw Direct, Trial Tr. Vol. II, 110:8-111:8; Def.'s Ex. 22.)

15.     Notwithstanding the interview team's recommendations, Mr. Wardlaw chose to invite Plaintiff to the final round of interviews.  He did this because he thought Plaintiff was a long-term employee who had done "an admirable job as [a] customer service manager."  Thus, Mr. Wardlaw felt that "she deserved the opportunity to be looked at one last time."  (Wardlaw Direct, Trial Tr. Vol. II, 111:9-18.)

16.     The final candidates who Mr. Wardlaw interviewed were Plaintiff, John Malone, and Bill Duke. The final interviews were conducted by Van Wardlaw, Jimmy Allen, and Laura Campbell.  (Wardlaw Direct, Trial Tr. Vol. II, 111:19-25; Best Direct, Trial Tr. Vol. I, 79:6-13.)

17.     Mr. Wardlaw was looking for four attributes during the interview, and he and his team asked interview questions that aligned with those attributes.  (Wardlaw Direct, Trial Tr. Vol. II, 112:17-113:9; 114:6-9; Def.'s Ex. 40.)

18.     The first factor was "leadership, management, previous managing experience." (Wardlaw Direct, Trial Tr. Vol. II, 113:19-21.)  This was important because the General Manager is responsible for creating a "good, positive work environment where people can come to work every day and feel appreciated."  (Wardlaw Direct, Trial Tr. Vol. II, 114:16-115:6.) Neither Plaintiff nor Mr. Malone had extensive experience in that area, so Mr. Wardlaw "graded them about the same level."  (Wardlaw Direct, Trial Tr. Vol. II, 115:8-14.)

19.     The second factor was how well the candidate worked with customers.  (Wardlaw Direct, Trial Tr. Vol. II, 113:16-21.)  Specifically, Mr. Wardlaw was looking at which candidate would be able to build on TVA's positive relationships with its customers in Mississippi. (Wardlaw Direct, Trial Tr. Vol. II, 115:21-24.)  Both Mr. Malone and Plaintiff had "done a really nice job" working with their respective customers.  On this factor, Plaintiff "may have had a little bit of an edge, but they were basically close."  (Wardlaw Direct, Trial Tr. Vol. II, 115:25-116:11.)

20.     The third factor was "networking skills," which refers to whether someone has the "ability to get things from the bigger TVA into this particular part of the country. . . ."  (Wardlaw Direct, Trial Tr. Vol. II, 113:22-25.)  To be successful as a General Manager, you have to "be very, very good at understanding how TVA, the bigger corporation, operates and runs." (Wardlaw Direct, Trial Tr. Vol. II, 117:7-11.)  Mr. Wardlaw was personally familiar with this skill, as he had spent a lot of time in Mississippi in the earlier part of his career, and it was not until he worked at other parts of the agency that he "fully understood the criticality of competing

for resources and skills and that sort of thing." (Wardlaw Direct, Trial Tr. Vol. II, 117:12-19.) Mr. Malone was stronger than Plaintiff on this factor, given that he had worked in TVA corporate in Chattanooga, and had also worked at other parts of TVA. (Wardlaw Direct, Trial Tr. Vol. II, 117:23-118:11.)

21.     The fourth factor was "executive skills," or the "ability to lead" and "to represent TVA as the face of TVA in the state of Mississippi." (Wardlaw Direct, Trial Tr. Vol. II, 114:2-5.) This was important to the General Manager position because that person "has to be very poised, has to be very confident, has to be a good communicator, a very good public speaker." The General Manager may often have to speak in public, must deal with high-ranking officials, and must "stay very calm, very cool, very collected" under stress. (Wardlaw Direct, Trial Tr. Vol. II, 118:24-119:18.) Mr. Wardlaw also described this factor as "executive presence." Mr. Wardlaw testified that when he considers that term, he is "[t]hinking about poise, confidence, public speaking, problem solving, conflict resolution, dealing with stressful situations and environments, and doing that in a way that gives people confidence that . . . everything's going to be okay; that you understand the situation; that you're going to work hard." (Wardlaw Direct, Trial Tr. Vol. II, 119:23-120:4.)

22.     On this fourth factor, Mr. Wardlaw testified that Mr. Malone was "solidly ahead." (Wardlaw Direct, Trial Tr. Vol. II, 121:14-17.) Mr. Wardlaw observed that "[d]uring the interview process, [Mr. Malone] handled himself extremely well, answered these questions very thoroughly, stayed on point, was very consistent with his message, did not flinch when we were pressuring him a little bit to get more detailed about a particular question." Mr. Wardlaw also noted that he had known both Plaintiff and John Malone for 25 years, during which he had observed them in forums, meetings, and public speaking engagements. (Wardlaw Direct, Trial

Tr. Vol. II, 121:19-122:5.)  As compared to Mr. Malone, the testimony was that the Plaintiff "had a tendency to ramble, to come off point, to come off topic, to say a lot of words that really weren't relevant to the question that was being asked" and that these tendencies "can get you in a lot of trouble in public speaking environments, especially with the media."  Mr. Wardlaw further testified that this "tendency on her part gave [him] a lot of pause relative to [the plaintiff's] ability to be successful in this job."  (Wardlaw Direct, Trial Tr. Vol. II, 122:6-15.)

23.     Laura Campbell, who previously worked in a General Manager role and is personally familiar with the necessary skills for the job, confirmed the importance of executive presence.  (Campbell Direct, Trial Tr. Vol. II, 49:1-7; 53:15-20.)  She testified that this means "the ability to really speak forthrightly and with confidence and poise, particularly under pressure."  (Campbell Direct, Trial Tr. Vol. II, 52:6-8.)  Ms. Campbell felt this was important for the Mississippi General Manager position because it is the highest-ranking job in the state, and "this person represents TVA both in times of great pressure—but also in statewide events and, so, must project a good image for TVA."  (Campbell Direct, Trial Tr. Vol. II, 52:15-19.)  Ms. Campbell testified that John Malone showed executive presence because "he's always been poised, particularly in tough times.  He's able to take bigger issues and boil them down and communicate them in an effective way, both for his internal team and for the customers at large." (Campbell Direct, Trial Tr. Vol. II, 53:2-10.)

24.     Mr. Wardlaw did not make a decision immediately following the interview process.  He testified that "[he] knew both of these individuals, knew both of them were excellent employees, would do a really good job, [and he] had to deliberate quite a while and go back and forth on which way [he] should go here and sought additional counseling with folks to

8

try to gain more data points before [he] finally drew [his] final conclusion that John was the best choice." (Wardlaw Direct, Trial Tr. Vol. II, 123:5-11.)

25. One of the people that Mr. Wardlaw sought input from was Dr. David Deviney, who was a "consultant psychiatrist/psychologist [who] does reviews of people to look at their attributes, their personalities, their traits." (Wardlaw Direct, Trial Tr. Vol. II, 124:18-23.) Dr. Deviney opined that "John [Malone] was very consistent in his messaging, able to stay on point and articulate the message. [Plaintiff] had a tendency to ramble, get off point." (Wardlaw Direct, Trial Tr. Vol. II, 124:1-4.)

26. Another manager at TVA, Steve Chunn, also reinforced that he thought John was the stronger candidate. (Wardlaw Direct, Trial Tr. Vol. II, 124:8-17.)

27. Mr. Wardlaw testified that he took several months to make the General Manager selection because it was important for him to "get it right" both personally and professionally. He testified that he worked for TVA in Mississippi for many years and has family there, so he felt that his reputation and legacy were at stake in the sense that all of the people who he had worked with over the years would be impacted by his decision. (Wardlaw Direct, Trial Tr. Vol. II, 137:10-138:14.) Mr. Wardlaw went as far as to write draft job announcements for both John Malone and Plaintiff to further his deliberations. (Wardlaw Direct, Trial Tr. Vol. II, 124:18-127:11.)

28. Ultimately, however, Mr. Wardlaw "had to make the call." He selected John Malone in April 2013. (Wardlaw Direct, Trial Tr. Vol. II, 127:16-17; Best Direct, Trial Tr. Vol. I, 83:3-5.)

29. John Malone was 49 years old at the time of the selection; Plaintiff was 56. (Malone Direct, Trial Tr. Vol. I, 159:1-8; Best Direct, Trial Tr. Vol. I, 51:1-2; 94:21-23.) Mr.

Wardlaw did not know the exact ages of John Malone and Plaintiff at the time of the selection, but he did know that John Malone was probably "slightly younger" than him, and that Plaintiff was "slightly older" than him, simply based on the number of years that each of them had worked at TVA.  (Wardlaw Direct, Trial Tr. Vol. II, 136:12-20.)

30.    Mr. Wardlaw testified that he did not take the candidates' ages into consideration. (Wardlaw Direct, Trial Tr. Vol. II, 136:25-137:6.)

31.    Laura Campbell, who was involved in both the initial and final interview rounds, corroborated this.  For her part, she testified that Mr. Wardlaw did not mention age during the selection process, and that she did not observe Mr. Wardlaw treating Plaintiff any differently than the other candidates.  (Campbell Direct, Trial Tr. Vol. II, 51:6-18.)

32.    Plaintiff presented several theories at the trial why she was not selected for the General Manager job based on her age.  Her primary theory was that she was better qualified than the selectee, John Malone.  In support of that theory, Plaintiff pointed out that during the year immediately preceding her interview for the General Manager position, she received an "Exceeds" on her performance review, which is TVA's best possible performance review rating. (Best Direct, Trial Tr. Vol. I, 79:14-19; *see also* Pl.'s Ex. 23.)  In the year immediately preceding the Mississippi General Manager selection, John Malone received a "Meets" performance review rating, which is less than an "Exceeds" rating on TVA's scale.  (Malone Direct, Trial Tr. Vol. I, 172:6-15; Pl.'s Ex. 11.)

33.    Joie Brown testified that, in this particular selection, TVA did not use performance review history as part of its records review because there were several job candidates from outside TVA for whom job performance history was not available.  Thus, there

were no consistent performance history criteria to be applied to all candidates.  (Brown Direct, Trial Tr. Vol. II, 64:18-65:18; Pl.'s Ex. 39.)

34.     Mr. Wardlaw also testified that Plaintiff's higher performance review did not affect his decision-making because "[r]atings on lower level jobs, as long as they were satisfactory, create the entry point [to be considered for the job]."  (Wardlaw Direct, Trial Tr. Vol. II, 129:24-130:1.)

35.     Also in support of her theory that she was clearly better qualified than Mr. Malone, Plaintiff proffered evidence that she received recommendation letters from many of TVA's Mississippi local power companies.  (Pl.'s Exs. 24-36.)  The heads of three of those local power companies—Terry Kemp, Johnny Timmons, and Wayne Henson—all testified at trial that they recommended Plaintiff for the job, and that they believed she would have been well-qualified for the role.  (Timmons Direct, Trial Tr. Vol. I, 116:3-13; Henson Direct, Trial Tr. Vol. II, 18:2-19:13; Kemp Direct, Trial Tr. Vol. II, 8:15-25; Kemp Direct, Trial Tr. Vol. II, 12:20-25; *see also* Pl.'s Exs. 24-36.)  However, each of these witnesses also testified that they were not familiar with Mr. Malone at the time of the selection and, therefore, could not compare his qualifications and/or interview performance to Plaintiff's.  (Timmons Cross, Trial Tr. Vol. I, 121:17-122:3; Kemp Direct, Trial Tr. Vol. II, 13:1-7; 15:7-25; Henson Direct, Trial Tr. Vol. II, 19:14-16; 20:10-25.)

36.     Joie Brown testified that TVA does not generally require recommendation letters as part of its selection process.  She has never been involved in a selection process where recommendation letters were required.  (Brown Direct, Trial Tr. Vol. II, 65:19-66:7.)

37.     Mr. Wardlaw similarly testified that he did not consider Plaintiff's recommendation letters in his final decision because it would not have been fair, given that

neither Mr. Malone nor Bill Duke (the other final candidate) had any letters that Mr. Wardlaw could compare to Plaintiff's. (Wardlaw Direct, Trial Tr. Vol. II, 130:2-23.)

38. In further support of her theory that she was clearly better qualified than Mr. Malone, Plaintiff asserted that Mr. Malone did not have seven years of "management of complex customer issues," as set forth in the minimum qualifications of the vacant position announcement. In contrast, Plaintiff testified that she "exceeded" the minimum qualifications for the job, and that she had "over 17 years of management." (Best Direct, Trial Tr. Vol. I, 71:11-24; 85:2-5.) Throughout her testimony, Plaintiff differentiated between her TVA jobs that were union jobs (i.e., jobs represented by an engineering union) and her TVA jobs that were "management" jobs (i.e., jobs not represented by any union). (*See* Best Direct, Trial Tr. Vol. I, 53:12-54:6; 63:8-24; 66:7-13; *see also* Pl.'s Ex. 2.)

39. Although Plaintiff did not herself testify about the meaning of the term "management of complex customer issues," her counsel suggested at trial that this means that the General Manager must have worked in a job that was on TVA's "management & specialist" pay scale. Joie Brown, who works in Human Resources and is familiar with the vacant position announcement, testified that it does not require a certain amount of years in a "management" position; rather, it means what it says: "management of complex customer issues." (Brown Re-direct, Trial Tr. Vol. II, 96:3-97:15.)

40. Plaintiff's testimony emphasized "Form 1" documents outlining her and Mr. Malone's respective job histories. On the "Form 1," the column labeled "schedule/grade" refers to the employee's pay scale at TVA. "M" refers to "management & specialist" employees, which are those positions that are not union-represented. This does not speak to an employee's actual job duties; it only indicates whether the employee is paid according to a TVA pay scale or

a union-negotiated pay scale. The "M" is used for a wide range of jobs, such as human resources generalists, consultants, analysts, managers, directors, senior managers, and recent college graduates. (Brown Direct, Trial Tr. Vol. II, 69:24-71:23; Pl.'s Exs. 2-3; Malone Cross, Trial Tr. Vol. I, 176:25-177:3.)

41.    Mr. Wardlaw did not have any involvement in screening the applicants for the minimum qualifications. Monica Stevens, a TVA recruiter, is the person who decided that John Malone and Plaintiff both met the minimum qualifications. (Brown Direct, Trial Tr. Vol. II, 91:2-9.) This would have occurred at the very first stage of the selection process. (Brown Re-direct, Trial Tr. Vol. II, 96:7-17.)

42.    Mr. Wardlaw testified that the minimum qualifications for the job did not factor into his decision-making, because they only told him that the candidates had the "acceptable level of skills to be considered for a job." He explained that the minimum qualifications are "not an indication of what you will be when you go to the next level. We've all seen people that were very good at a job that did not make good bosses." (Wardlaw Direct, Trial Tr. Vol. II, 127:24-128:8.) By the time the candidates had reached the final interview round, Mr. Wardlaw was "pretty well confident that everybody [had] the basic skills to get to this particular part of the interview." (Wardlaw Direct, Trial Tr. Vol. II, 112:3-7.) He further explained: "at this juncture, you're really trying to begin to separate the difference from being a good manager or a good worker in that group to being a leader of an organization, to being a leader of the state, if you will, for the agency. So the bar's going up quite a bit. And, so, the expectation and the skill set you're looking for are going to be quite different." (Wardlaw Direct, Trial Tr. Vol. II, 112:8-14.)

43.    Mr. Wardlaw testified that it never crossed his mind that Mr. Malone was not qualified for the General Manager position. (Wardlaw Direct, Trial Tr. Vol. II, 135:5-8.)

44.     Laura Campbell, who had been Mr. Malone's immediate supervisor for the two to three years immediately preceding his selection as General Manager, testified that it also never crossed her mind that he was not qualified.  She stated:

> "John had a great background for the position.  He has an engineering degree.  He had been with TVA and served in several different locations within TVA, so he understood how to make things happen within the bigger organization.  He had served as a power utilization engineer, which is−roughly half the staff are power utilization engineers, so he understood their challenges.  And he had been a customer service manager, so had worked with the customers.  And, also, he had been a transmission planner; so an engineer who oversees the planning and design of the transmission system and−particularly for Mississippi.  And so, he had . . . both the relationships and the credibility with the customers.

(Campbell Direct, Trial Tr. Vol. II, 53:21-54:6-55:1.)

45.     Mr. Wardlaw testified that his performance as a TVA executive is judged based on how successful TVA's Mississippi office is.  He would "most definitely not" want an unqualified person in the role, because that "would make [his] life miserable."  (Wardlaw Direct, Trial Tr. Vol. II, 105:17-24; 135:5-8.)  Ms. Campbell similarly testified that she would not have wanted an unqualified person in the General Manager role, because the person chosen would have become her peer.  (Campbell Direct, Trial Tr. Vol. II, 55:9-16.)

46.     The Court finds that Plaintiff was not clearly better qualified than Mr. Malone.  Upon reviewing all of the evidence, the Court notes that both candidates had similar backgrounds and qualifications.  And the Court finds credible Mr. Wardlaw's detailed explanations about why Mr. Malone outperformed Plaintiff in the final interview, which formed the primary basis for his ultimate decision.

47.     The Court was also able to observe the demeanor of both Plaintiff and Mr. Malone at trial, and finds that their demeanor was consistent with Mr. Wardlaw's description of their respective interview performance.

48.     As to Plaintiff's claim that Mr. Malone did not meet the minimum qualifications, the Court finds that Plaintiff did not present any evidence tending to show that "management of complex customer issues" equated to being paid according to TVA's "management & specialist" pay scale.

49.     Plaintiff also presented a theory that her direct supervisor, Gary Harris, harbored animus toward older employees.  Specifically, she testified that, after she was not selected, Mr. Harris told her that she "had waited too late in [her] career to try to advance;" and that she was "just too damn old."  (Best Direct, Trial Tr. Vol. I, 91:6-9; 93:19-94:19.)  Plaintiff implied that Mr. Harris somehow influenced Mr. Wardlaw's decision, testifying generally that TVA relies on information from immediate supervisors in making hiring decisions; however, she did not offer any evidence to substantiate her theory.  (Best Direct, Trial Tr. Vol. I, 93:6-11.)

50.     Plaintiff also called Leanne Whitehead, who was a TVA employee from 1985 until 2014, in furtherance of her theory.  (Whitehead Direct, Trial Tr. Vol. II, 23:23-24:19.) During her 29-year career at TVA, Ms. Whitehead participated on five interview panels. (Whitehead Direct, Trial Tr. Vol. II, 25:15-20.)  Based on these five selections, Ms. Whitehead testified that it is "standard practice at TVA for the selection committee to get information from each candidate's direct supervisor prior to making any decision."  (Whitehead Direct, Trial Tr. Vol. II, 25:21-26:3.)  Mr. Wardlaw was not involved in any of the five selection panels that Ms. Whitehead served on,   (Whitehead Cross, Trial Tr. Vol. II, 30:2-7.)  and none of the five selection panels that Ms. Whitehead served on were for a General Manager job.  (Whitehead Cross, Trial Tr. Vol. II, 30:8-18.)  Additionally, Ms. Whitehead has never worked in TVA Human Resources; thus, other than the five selections she participated in, she did not have

knowledge of what TVA's general hiring practices are.  (Whitehead Cross, Trial Tr. Vol. II, 30:19-31:16.)

51.     Ms. Whitehead additionally testified that Gary Harris made age-based comments toward her in December 2011 after she applied for a promotion at TVA.  (Whitehead Direct, Trial Tr. Vol. II, 26:19-27:13; 28:9-13.)

52.     Plaintiff admitted that Gary Harris was not the selecting official and that "as far as [she] know[s]," Mr. Harris did not play any role in the General Manager selection.  (Best Cross, Trial Tr. Vol. I, 106:17-107:18.)

53.     Joie Brown testified that Mr. Harris was not involved in the portion of the selection process that she participated in.  (Brown Direct, Trial Tr. Vol. II, 69:18-21.)

54.     Mr. Wardlaw similarly testified that Mr. Harris did not play any significant role in the selection process.  (Wardlaw Direct, Trial Tr. Vol. II, 133:24-134:13.)

55.     Mr. Wardlaw is Gary Harris's boss; Mr. Harris does not have any power or control over Mr. Wardlaw.  (Wardlaw Direct, Trial Tr. Vol. II, 134:18-22.)

56.     The Court does not find the testimony regarding Gary Harris's alleged comments to be probative of age discrimination in the hiring decision because there was no credible evidence connecting Mr. Harris's alleged statements to the selection process at issue.

57.     Plaintiff also argued that she had shown a "pattern and practice" of age discrimination at TVA.  Plaintiff testified about two other instances where TVA hired employees who were younger than she into General Manager positions.  (Best Direct, Trial Tr. Vol. I, 95:22-98:7.)  She also testified that, at the time of her non-selection, there were seven General Manager jobs at TVA, and that at least one of those positions was occupied by a younger person

"[i]n her 30s."[1]  (Best Direct, Trial Tr. Vol. I, 99:24-100:10.)  Shortly after, the younger person

was replaced by a "woman in her early 50s."  (Best Direct, Trial Tr. Vol. I, 100:11-17.)  There

was, however, no evidence presented that Mr. Wardlaw was involved in all of these selections.

58.     Mr. Wardlaw testified that he had recently promoted at least two people over the

age of 55, Cindy Herron and Joe Hoagland.  (Wardlaw Direct, Trial Tr. Vol. II, 135:22-136:8.)

59.     The Court finds that Mr. Wardlaw has promoted a number of individuals during

his career—both younger and older, and both male and female.  Thus, the testimony did not

show any pattern by Mr. Wardlaw from which the Court could draw any inference of intentional

age discrimination in the General Manager selection.

60.      Plaintiff also complained that the selection process was not fair because it was

subjective in nature.  The Court finds otherwise.  Based on the testimony presented, the Court

observes that although the process TVA used contained some subjective components, Mr.

Wardlaw was able to describe in detail how the subjective factors directly related to the General

Manager job.  The Court further notes that the same subjective standards were applied equally to

all job candidates, and that Mr. Wardlaw otherwise treated all candidates the same during the

selection process.

## II. Conclusions of Law

61.     The Age Discrimination in Employment Act ("ADEA") prohibits age

discrimination in personnel actions taken by the federal government.  *See* 29 U.S.C. § 633a(a)

(stating that all federal personnel actions "shall be made free from any discrimination based on

age").  The Supreme Court has held that ADEA plaintiffs have the burden of proving by the

---

[1]     This person "[i]n her 30s" was Laura Campbell, who testified that she was, in fact, 47 years old at the time
of trial.  (Campbell Direct, Trial Tr. Vol. II, 48:11-15.)

preponderance of the evidence that their age was the "but-for" cause of the relevant adverse employment action. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009).

62. This Court recognizes that *Gross* addressed the ADEA's private-sector provision, which provides that "it shall be unlawful for an employer [to take a personnel action] *because of such individual's age.*" 29 U.S.C. § 623(a) (emphasis added), and at least one circuit has determined that *Gross*'s "but-for" standard only applies in this context. *See Ford v. Mabus*, 629 F.3d 198, 206 (D.C. Cir. 2010) (finding the federal-sector provision's language broad enough to allow plaintiffs to "prevail by proving that age was *a* factor in the employer's decision"). At least one other circuit disagrees. *See Shelley v. Geren*, 666 F.3d 599 (9th Cir. 2012) ("To prevail on a claim for age discrimination under the ADEA, a plaintiff must prove at trial that age was the 'but-for' cause of the employer's adverse action."). This particular question is unanswered in the Fifth Circuit. *See Leal v. McHugh*, 731 F.3d 405, 412 (5th Cir. 2013) (finding it unnecessary to decide whether a federal plaintiff must prove but-for causation or some lesser standard under § 633a because . . . Appellants' complaint states a claim for relief under the heightened, but-for standard in *Gross*").

63. The Court finds no meaningful distinction between the ADEA's private- and federal-sector language and sees no reason to depart from the Court's directive in *Gross*. This analytical route is particularly appropriate in light of *Gross*'s declaration that a mixed-motive theory "is *never proper* in an ADEA case." 557 U.S. at 170 (emphasis added). The Court concludes that Plaintiff failed to meet her burden, as required by *Gross*, to show by a

preponderance of the evidence that age was the "but-for" cause of her non-selection for the General Manager position.[2]

64.     The evidence showed that Mr. Wardlaw, who chose Mr. Malone over Plaintiff for the General Manager position, did so for the legitimate reason that Plaintiff did not perform as well as Mr. Malone in the final interview round.  This final interview occurred after a multi-step process in which other individuals—not Mr. Wardlaw—decided who would proceed.  And when those individuals did not view Plaintiff as having performed well enough during the first interview to be considered in the final round, Mr. Wardlaw—the person Plaintiff claims discriminated against her—nevertheless handpicked her to participate in the final stage based on his positive experiences with her in the past.  Plaintiff presented no evidence that her performance during the final interview with Mr. Wardlaw was superior to the selectee's, Mr. Malone, and thus did not call into question the propriety of Mr. Wardlaw's decision.

65.     Plaintiff nonetheless attempted to establish that age was the actual reason for her non-selection by presenting evidence that (1) she was better qualified than Mr. Malone; (2) TVA engaged in a pattern and practice of promoting only younger individuals; and (3) Plaintiff's supervisor, Gary Harris, made several comments about her age.  None of these methods of proof served to establish that Plaintiff's age was the "but-for" cause of Mr. Wardlaw's decision to choose Mr. Malone over Plaintiff.

66.     With regard to Plaintiff's argument that she was better qualified than Mr. Malone, it is not sufficient for her to demonstrate that she is as qualified as, or even better qualified than, Mr. Malone.  *EEOC v. La. Office of Cmty. Servs.*, 47 F.3d 1438, 1444 (5th Cir. 1995).  Instead,

---

[2]     Even assuming that the appropriate causation standard to apply to this claim is the "substantial factor" test, the Court would reach the same conclusion and the same disposition of Plaintiff's ADEA disparate treatment claim for the reasons stated in these Findings of Fact and Conclusions of Law.

Plaintiff faces the heavy burden of showing that she was "clearly better qualified" than Mr. Malone. *Id.* The "bar is set high for this kind of evidence." *Moss v. BMC Software, Inc.*, 610 F.3d 917, 923 (5th Cir. 2010). To clear this tall hurdle, Plaintiff had to show that "no reasonable person, in the exercise of impartial judgment, could have chosen" Mr. Malone instead of her for the Mississippi General Manager position. *Id.* For the reasons stated in the Court's factual findings (para. 46 *supra*), the Court finds that Plaintiff did not present sufficient evidence at trial to meet this heavy standard.

67.     As to the "pattern and practice" evidence, this method of proof may not be used in a lawsuit that is not a class action. *See Roy v. U.S. Dep't of Agric.*, 115 F. App'x 198, 201 (5th Cir. 2004) (per curiam) (holding that a "'pattern and practice of discrimination' claim . . . is inapplicable to [an] individual claim of racial discrimination" (citing *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 356-57 (5th Cir. 2001)); *Frank v. Xerox Corp.*, 347 F.3d 130, 136 (5th Cir. 2003) (holding that the plaintiffs' pattern or practice claims fail in light of *Celestine*); *Richmond v. Coastal Bend Coll. Dist.*, 883 F. Supp. 2d 705, 718 (S.D. Tex. 2012) ("In the Fifth Circuit, the pattern-or-practice method of proof is not available in private, non-class action lawsuits." (citing *Frank*, 347 F.3d 136)). It is undisputed that Plaintiff brought an individual claim; thus, her attempt to utilize this method of proof fails. Even if Plaintiff were able to use this method of proof, for the reasons stated in the Court's factual findings (para. 60 *supra*), the Court finds that Plaintiff did not present any probative evidence of a general pattern or practice.

68.     Plaintiff's evidence that Mr. Harris made several remarks about her age likewise fails to establish her burden. In order for these remarks to constitute relevant circumstantial evidence of discrimination, Plaintiff was required to demonstrate that Mr. Harris was either "primarily responsible for" the Mississippi General Manager selection or that he had "influence

or leverage over" Mr. Wardlaw, the ultimate decision-maker.  *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2000); *see also Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441-42 (5th Cir. 2012) (to be admissible, discriminatory remarks must be made by someone responsible for the employment decision); *Rubenstein v. Administrators of Tulane Educational Fund*, 218 F.3d 392, 401 (5th Cir. 2000) (noting that the comments must be "made by an individual with authority over the employment decision at issue").  There was no credible evidence presented at trial that Mr. Harris had any involvement in Mr. Wardlaw's decision.  Nor was there any evidence that Mr. Harris had any leverage over Mr. Wardlaw (Mr. Harris's boss) in making the decision of who should fill the Mississippi General Manager position.  Thus, even assuming Mr. Harris made ageist statements about Plaintiff, they cannot be used to establish that an entirely different person—Mr. Wardlaw—engaged in age discrimination.

69.     With respect to Plaintiff's claim that the interview process was subjective, the Court finds that subjective reasons can be just as valid as objective reasons."  *Chapman v. AI Transp.*, 229 F.3d 1012, 1034 (11th Cir. 2000).  Indeed, "subjective evaluations of a job candidate are often critical to the decision-making process."  *Id.* at 1033.  TVA's subjective decisions were legally sufficient because it "articulate[d] a clear and reasonably specific factual basis upon which it based its subjective opinion."  *Id.* at 1034.

70.     Finally, the Court observes that, in light of the other evidence presented, Mr. Malone's age—49 years old—fails to create any reasonable inference that age could have been a factor motivating Mr. Wardlaw to choose Mr. Malone over Plaintiff.  In order to create the inference that Mr. Wardlaw's decision was infected by age discrimination, it was Plaintiff's burden to demonstrate that the selectee was "substantially younger" than she.  *See, e.g.*, *Flanner v. Chase Inv. Servs. Corp.*, 600 F. App'x 914, 918 (5th Cir. 2015) ("[A] plaintiff's replacement

must be 'substantially younger' to create an inference of discrimination."). In the Fifth Circuit, there is no age disparity that serves as a bright-line cut-off that will or will not establish that the beneficiary of an employment action is "substantially younger" than the aggrieved plaintiff. *See Flanner v. Chase Inv. Servs. Corp.*, 600 F. App'x 914, 919 (5th Cir. 2015). But it has noted that a five or six year difference is a "close call," and in such instances, a court should "consider[] the relative ages of the plaintiff and the replacement employee as evidence on the ultimate issue of proving 'but for' causation." *Flanner v. Chase Inv. Servs. Corp.*, 600 F. App'x 914, 919 (5th Cir. 2015).

71.     The Court finds, under the circumstances, that the minimal disparity in Plaintiff's and Mr. Malone's ages is not enough to warrant an inference of discrimination, particularly in light of the fact that Plaintiff presented no other probative evidence in support of her claim.

<u>CONCLUSION</u>

In accordance with the foregoing findings of fact and conclusions of law, the Court finds that judgment should be entered against the Plaintiff, and in favor of Defendant, on Plaintiff's ADEA claim. The Court will enter judgment accordingly.

This, the 19th day of January, 2017.

    /s/ Neal Biggers               
**NEAL B. BIGGERS, JR.**
**UNITED STATES DISTRICT JUDGE**